IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                      :
RALPH R. JERRY, PLAINTIFF             :        3:05 CV 1315 (JBA)
                                      :
                                      :
V.                                    :
                                      :
JO ANNE B. BARNHART, COMMISSIONER     :        DATE: SEPTEMBER 8, 2006
                                      :
-------------------------------------------------------x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS
AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security["the Commissioner"], that denied plaintiff Supplemental Security Income benefits ["SSI"].

## I. ADMINISTRATIVE PROCEEDINGS

On October 6, 2003, plaintiff filed his application for SSI.  (See Certified Transcript of Administrative Proceedings, filed October 11, 2005 ["Tr."] 60-62).  The application was initially denied on November 15, 2003.  (See Tr. 26-28).  On November 25, 2003, plaintiff filed a request for reconsideration (See Tr. 29-30) and on January 2, 2004, the denial of benefits was affirmed. (See Tr. 31-33).

On February 25, 2004, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"].  (See Tr. 34-35, 84-88). Such hearing was held before ALJ Liberman on July 19, 2004, at which plaintiff was represented by counsel.  (See Tr. 36-46, 246-68).  ALJ Liberman held a continued hearing to include expert testimony on January 31, 2005.  (See Tr. 47-59, 269-92). At such hearing plaintiff again was represented by counsel, and Bill Fuess, Ph.D., a clinical psychologist, and Ronald Freedman, a vocational expert, testified.

1

(See Tr. 47-59, 269-92).

On March 8, 2005, ALJ Liberman issued his decision finding that plaintiff is not disabled within the meaning of the Social Security Act because the severity of the plaintiff's impairments, individually and in combination, do meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (See Tr. 13-23). ALJ Liberman concluded that plaintiff has the residual functional capacity to perform all extertional work activity and limited non-extertional simple repetitive entry level work, except jobs requiring interaction with the public. (See Tr. 20-22). ALJ Liberman also found that although plaintiff's major depression and history of alcohol abuse are considered severe, plaintiff could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. (See Tr. 21-22).

Plaintiff thereafter appealed the ALJ's decision on March 31, 2005. (See Tr. 9-12; see also Tr. 244-45).   On June 7, 2005, plaintiff's request for review was denied by the Appeals Council (see Tr. 5-7), rendering the ALJ's decision, dated March 8, 2005, the final decision of the Commissioner of Social Security.

On August 18, 2005, plaintiff initiated the pending action, pro se, to reverse the adverse decision of the Commissioner. (Dkt. #3). On November 8, 2005, defendant filed her Answer. (Dkt. #7).[1]   On December 16, 2005, United States District Judge Janet Bond Arterton referred the file to this Magistrate Judge.[2]  (Dkt. #9).

_____

[1]Attached to defendant's Answer is a certified copy of the transcript of the record, dated October 11, 2005.

[2]Judge Arterton initially referred this file for a ruling on plaintiff's Motion to Appoint Counsel (see Dkts. ##8-9), which this Magistrate Judge granted on January 5, 2006.  (Dkt. #10; see Dkts. ##11-12).  The pending motions were referred to this Magistrate Judge on May 12, 2006.  (Dkt. #19).

2

On April 10, 2006, plaintiff filed his Motion for Judgment on the Pleadings and brief in support (Dkts. ##15-16), and one month later, on May 11, 2006, defendant filed her Motion to Affirm the Decision of the Commissioner and brief in support. (Dkts. ##17-18).

For the reasons stated below, plaintiff's Motion for Judgment on the Pleadings (Dkt. #15) is denied and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is granted.

## II. FACTUAL BACKGROUND

Plaintiff was born on October 2, 1952; he is fifty three years old. (See Tr. 17, 60, 171).  He graduated high school in 1970 and was drafted into the military in 1972. (See Tr. 17, 78, 94 200).  Plaintiff has been married twice. (See Tr. 60, 161, 166, 172).  The first marriage ended in divorce in 1972. (See Tr. 60, 172).  Plaintiff testified that he is separated from his second wife, Bernadine Jerry, whom he married in 1984.  (See Tr. 172, 200, 250, but see Tr. 60).  Plaintiff reported that he has two children: a son, born on February 18, 1972, from a "third" woman, and another son born on October 17, 1980.[3] (See Tr. 172).

In 1972, plaintiff was drafted into the military and stationed in Germany.[4]  (See Tr. 171, 200).  During his tour in Germany, plaintiff claims to have been picked out of a line-up and falsely accused of the rape and sodomy of a female civilian. (See Tr. 166, 171, 200). Plaintiff appeared  before a German court and was found not guilty of those charges. (See Tr. 166, 171, 200).  Plaintiff returned from Germany and was honorably discharged from the military. (See Tr. 166, 200).  In 1975, plaintiff joined the National Guard in South Carolina.

---

[3]According to plaintiff, his children know of him, but he did not have a role in raising them. (See Tr. 172; see also Tr. 161, 166).

[4]Plaintiff reports on his SSI application that he has never resided in another country. (See Tr. 60)

3

(See Tr. 166, 171, 200).

In 1980, plaintiff attended a substance abuse treatment program for alcohol dependence.  (See Tr. 166, 172). Two years later, plaintiff pled no contest to charges of rape and burglary and was incarcerated from 1982 untill1993.[5]  (See Tr. 161, 166, 171-72, 200). In 1994, plaintiff relocated to Connecticut and obtained a chauffeur's license and began working for a limousine service. (See Tr. 200). In 1996, plaintiff was in an automobile accident and testified that he received Workers' Compensation for one year due to injuries to his left kidney.  (See Tr. 254-255, 258).  As a result of this automobile accident, plaintiff reports a 2% disability to his kidney and 5% disability to his lumbar spine. (See Tr. 201, 254-55).  In 1999, while in Connecticut, plaintiff pled no contest to charges of breaking and entering and was incarcerated from 1999 until May 2003.  (See Tr. 166, 172, 200, 253).[6]

Plaintiff's prior work history includes employment as a chef in the military, as an operator of heavy equipment, and as a limousine chauffeur. (See Tr. 63-70, 73, 110, 149, 167, 200, 230, 252-54).  Plaintiff also reports cutting grass and working in the laundry facility in prison. (See Tr. 254). Plaintiff has a history of homelessness, but is currently residing with friends in Bridgeport, Connecticut. (See Tr. 135, 160, 166, 171-72, 250).  During those periods of homelessness,  plaintiff reports  staying occasionally with his sister, during which time he would receive correspondence at her residence. (See Tr.  94,171, 251).

On June 30, 2003, plaintiff was evaluated by Dr. Susan Kruger at the Veterans

---

[5]There are several inconsistencies within the transcript with regard to the year that plaintiff's incarceration for rape and burglary began. Plaintiff reported  during his intake evaluation on June 30, 2003, that  he served a prison term from 1982 until 1993. (See Tr. 171).  During a medication management appointment, however, plaintiff claims his incarceration began in 1980. (See Tr. 166). In his application for SSI benefits, plaintiff denied ever being convicted of a felony. (See Tr. 60).

[6]Plaintiff's commercial driver's license was withdrawn from him due to the felony arrests. (See Tr. 172).

4

Administration Medical Center ["VA"]  for a neuropsychiatry screening.  (See Tr. 171-74).

Plaintiff reported that "he fe[lt] down and that he has felt [that] way since the episode in

Germany." (See Tr. 171). According to plaintiff, "he [feels]  he [is] 'living  life under a cloud'"

and he feels "shame and embarrassment of being accused of such a heinous crime." (See

id.).  Plaintiff reported impaired sleep and a moderate appetite, denied suicidal ideation,  but

reported that he  "does destructive things like drinking and smoking pot" and sometimes

feels like it is hopeless and "it isn't worth trying." (See Tr.172). Plaintiff denied excessive use

of  alcohol,  but  reported  drinking  "a  nip  here  and  there  to  calm  [his]  nerves." (See

id.)(internal quotations omitted). Plaintiff also reported occasional marijuana use. (See id.).

Dr. Kruger diagnosed plaintiff with chronic adjustment disorder with depressed mood vs.

major depression, history of substance abuse with limited current use, cannabis use (rule out

abuse), and assigned plaintiff a Global Assessment of Functioning ["GAF"]  score[7] of 50,[8]

though  she  noted  that  this  "initial  impression  [is]  likely  to  change  as  [plaintiff]  is  better

characterized." (See Tr. 173).   Dr. Kruger found that plaintiff was "not volunteering of [post

traumatic stress disorder] ["PTSD"] symptoms, but is focused on events from Germany and

the  impact  of  [them]  on  his  life."(See id.).   Dr.  Kruger  referred  plaintiff  to  the  mood

medication clinic, to be followed by treatment by Anne Fowler, APRN, and possibly work

---

[7]The Global Assessment of Functioning ["GAF"] score is a report of clinician's overall
judgment of the individual's functioning and is rated with respect to psychological, social , and
occupational concerns. The assigned ratings on the GAF scale should reflect the level of functioning
at the time of evaluation. See American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental
Disorders at 32-33 (4th ed 2000) ["DSM-IV-TR"].

[8]A GAF score of 41-50 indicates either "serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

rehabilitation.[9] (See Tr. 173-74).

On September 5, 2003, plaintiff was evaluated by Nurse Fowler of the VA for medication management and for treatment of depressive symptoms. (See Tr.166-69). Plaintiff claims that his depression began in 1975 and "attributes being falsely accused of rape and sodomy" as the precipitating event of his depression. (See Tr. 166). Plaintiff reported feeling mildly depressed with a low energy level and sleep disturbance. (See id.). Plaintiff also reported feelings of worthlessness which began following his "episode" in Germany. (See id.). Nurse Fowler concluded that plaintiff had symptoms of depression and she ruled out chronic adjustment disorder. (See id.). Nurse Fowler further indicated that plaintiff's symptoms of a mood disturbance are "exacerbated by [that] traumatic experience in Germany and current stressors." (See Tr. 113). Plaintiff was prescribed Celexa 10mg qd. (See Tr. 167). Plaintiff was referred for a primary care medical physical on September 18, 2003 along with continued mental health treatment. (See id.).

On September 18, 2003, plaintiff underwent an educational assessment with Kathleen Carr at the VA, and was scheduled for a colorectal screening. (See Tr. 155-59). On the same day, plaintiff was evaluated by Deborah Miles, APRN, CS, at the VA to establish primary care.[10] (See Tr. 156-64; see also Tr. 165, 175-76). Plaintiff reported that he "perceives" himself as having medical problems and a "different" feeling to his testicles. (See Tr. 160). Plaintiff claims that, although the results of an ultrasound performed at the University of

---

[9]Plaintiff was scheduled for an appointment with Nurse Fowler on August 14, 2003. (See Tr. 170). There is no record of an examination on this date and it is unknown whether the appointment was cancelled or if plaintiff failed to show. (See id.). On August 20, 2003, Nurse Fowler telephoned plaintiff to schedule a mental health examination for September 5, 2003. (See Tr. 169).

[10]Nurse Miles' report was co-signed by Dr. James Solomon. (See Tr. 160-64).

Connecticut showed no abnormalities of his testicles, he is not convinced of the result's accuracy and reports nocturia up to three times a night, decreased stream, hesitancy, urgency, and pressure to void that seems inconsistent with the amount voided.  (See Tr. 160-62). Plaintiff also reported symptoms of erectile dysfunction. (See id.).   Nurse Miles diagnosed plaintiff with  benign  prostatic  hypertrophy ["BPH"] and  referred plaintiff for a urinalysis to monitor his PSA levels. (See Tr.162).  Plaintiff was prescribed Hytrin 2mg post lab results; plaintiff's request for Viagra was deferred. (See id.).  Nurse Miles also referred plaintiff for a baseline electrocardiogram, sigmoidoscopy, and an optometry consultation. (See Tr. 163).  Nurse Miles noted that plaintiff  presented with depression and alcohol and marijuana abuse. (See Tr. 162).  Plaintiff was "surprised that [the] amount of [alcohol] and [marijuana] use represents [a] problem." (See id.).  Plaintiff reported that he would attempt to decrease alcohol and drug use to assess the sexual side effects. (See id.).

On September 22, 2003, during a medication management evaluation, plaintiff reported to Nurse Fowler that  he was experiencing  a "burning sensation in [his] stomach" as a side effect of Celexa. (See Tr. 153).  Nurse Fowler discontinued Celexa and prescribed Paxil 10mg qd, with upward titration, for plaintiff's treatment of depression. (See id.). Nurse Fowler assigned plaintiff a GAF score of 50, at which time plaintiff reported a low mood, sleep disturbances and a fair appetite with some weight loss. (See id.).  Plaintiff reported to Nurse Fowler that he is "making a plan to purchase a 'Dump Truck' and is in the process of securing a loan to start his own business."  (See id.).

On October 27, 2003, plaintiff was evaluated by Melanese Kotey, R.N. at the VA for substance abuse treatment (see Tr. 151), and the next day, plaintiff was admitted to the Substance Abuse Day Treatment Program ["SADP"] for alcohol and marijuana dependence by Benjamin Toll, Ph.D. and David Pilkey, Ph.D.  (See Tr.146-50; see also Tr. 152).  Plaintiff

reported drinking  approximately four beers per day  and a half a pint of vodka every other day and smoking two joints of marijuana per day for the previous five months.[11]  (See Tr.146).  Plaintiff reported continued feelings of sadness, anhedonia,  guilt and hopelessness.  (See id.).  Dr. Toll diagnosed plaintiff with marijuana dependence, alcohol dependence, and cocaine dependence in early full remission and assigned plaintiff's GAF score at 40.[12] (See Tr.149).  Dr. Toll indicated that he would not diagnose the plaintiff with depressive disorder until plaintiff abstained from alcohol for a sustained period of time. (See Tr.146).   On or about the same date, David McNamara, R.N. conducted a housing assessment with plaintiff.  (See Tr.142). Nurse McNamara noted that he informed plaintiff what he must do to qualify for additional housing opportunities and VA support.   (See id.).

Upon admission to the rehabilitation program, Nurse Miles  re-examined plaintiff and noted that his symptoms of BPH improved slightly since the initiation of medication. (See Tr.143-45).  Plaintiff reported that there was less pressure to void but it was still not normal.  (See Tr.143). Plaintiff claimed that he continued to have nocturia, approximately two times per night, and urinary frequency that is inconsistent with fluid intake and continued erectile dysfunction.  (See Tr.143-44).  Nurse Miles also indicated that plaintiff's appetite was "okay" and that plaintiff denied chronic fatigue.  (See Tr. 144).   Plaintiff had "come to accept that substances may influence mood, sexual performance, and achieving goals." (See id.).   Nurse Miles reported that plaintiff's PSA and urinalysis were normal and plaintiff's symptoms

---

[11]Upon admission to the rehabilitation program, plaintiff denied current use of cocaine. (See Tr.146).  Plaintiff, however claimed prior use of cocaine, ranging from a "dime bag" to an "eight ball," every other day from 1997-1998. (See id.). Plaintiff reported that his last use of cocaine was in May 2003. (See id.).

[12]A GAF score of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work, or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). See DSM-IV-TR at 34 (emphasis omitted).

improved slightly as a result of the Hytrin. (See id.).

On November13, 2003, Gregory Hanson, Ph.D. reviewed plaintiff's file for disability determination purposes. (See Tr. 92-96, 98-112). Dr. Hanson diagnosed plaintiff with an affective disorder and substance addiction disorder and noted an RFC Assessment was necessary due to insufficient evidence. (See Tr. 98, 101, 106). He indicated that there was no evidence of plaintiff's level of functioning and a lack of certainty of the  presence of plaintiff's depressive disorder  without drugs or alcohol. (See Tr. 94). Dr. Hanson concluded that  plaintiff's ability to maintain attention and  concentration for extended periods, his ability to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerance, sustain a routine without supervision, work in coordination with or in  proximity to others without being distracted by them, and to make simple work related decisions is "not significantly limited." (See Tr. 92). Plaintiff, however, is "moderately limited" in his ability to understand, remember and carry out detailed instructions, and complete a normal workday or workweek or to interact appropriately with the general public.  (See Tr. 92-93).  Dr. Hanson indicated that plaintiff is able to immediately recall simple instructions, work locations, and basic procedures, "but any depression present may hamper recall of more detailed [three to four] step directions, especially during the days [when] he drinks or uses other substances." (See Tr. 92-94). Dr. Hanson also concluded that, although plaintiff's depressive symptoms and drinking impact his suitability for work with the public, plaintiff can interact at a basic level with others, keep a reasonable appearance, ask questions and form basic goals. (See Tr. 94). A vocational assessment, conducted the same day  by Bonnie Dewan, reveals that  plaintiff was not disabled and although plaintiff would not be able to return to his past work, plaintiff is capable of performing simple unskilled work such as working as a dial marker, a small

9

parts assembler, or a table worker. (See Tr.97).

On November 24, 2003, Nurse Fowler noted that plaintiff was responding positively to Wellbutrin and that his symptoms of depression had subsided.  (See Tr. 113-14, 135-36). Plaintiff reported that his mood improved since he started  Wellbutrin, however he continued to sweat as a side effect of the medication.[13]  (See Tr. 113, 135).   Plaintiff also reported that his sleep had improved since he began taking Trazodone. (See Tr.135).   Nurse Fowler indicated plaintiff was future-oriented, "significantly less irritable since he was started on Wellbutrin," and plaintiff was "planning on starting his own business should his commercial driving license be 'lifted.'" (See Tr.135).    Nurse Fowler refilled plaintiff's prescription for Wellbutrin and increased Trazodone to 100mg for sleep. (See id.).   She also directed plaintiff to continue supportive therapy. (See id.).

On or about this date, Nurse Fowler also completed a disability determination report for SSA in which she diagnosed plaintiff with "major depression and chronic adjustment disorder with depressed mood, [but] rule[d] out PTSD." (See Tr. 113-15). She also indicated that plaintiff's substance abuse was in remission.[14] (See Tr. 113). Nurse Fowler noted that plaintiff's depressive  symptoms had subsided since the initiation of Wellbutrin and although his sleep was still fragmented, this condition should improve with Trazodone. (See id.).  She indicated that plaintiff had a low motivational level, but  he was able to "slow-up-to-task completion" which was indicative of plaintiff's future success. (See Tr. 115). Moreover, Nurse Fowler observed that plaintiff's "[j]udgment and insight [were] good with respect to

---

[13]Plaintiff's prescription for Paxil was changed to Wellbutrin due to reported worsening of his erectile dysfunction. (See Tr.133).

[14]During his medical evaluation on November 24, 2003, it was reported that plaintiff completed the substance abuse day program, but admitted to occasional alcohol use. (See Tr. 133).  Plaintiff tested positive for cocaine use on November 13, 2003. (See id.).

complying with [the] treatment plan" and plaintiff is capable of handling his own benefits. (See Tr. 114-15).  Dr. D'Souza co-signed this report. (See Tr. 115).

On December 8, 2003, plaintiff was reevaluated by Nurse Miles in the Primary Care Clinic.[15]  (See Tr.132-34).  Nurse Miles noted plaintiff's symptoms of BPH  had improved and his PSA levels and urinalysis were normal.  (See Tr. 133). Plaintiff reported that impotency was his chief complaint, as he classified himself as "90% impotent."  (See id.).  Plaintiff indicated he had started a new relationship and his sexual dysfunction has "weighed heavy on his psychological well-being." (See Tr. 133-34).   Nurse Miles  also noted that  the results of a urine screen, dated November 13, 2003, revealed that plaintiff tested positive for cocaine. (See Tr.134).  Although plaintiff desired to regain his commercial driver's license, Nurse Miles noted that she refused to certify him to operate a motor vehicle without a negative urine sample, which plaintiff declined to provide. (See id.).  Nurse Miles refilled the prescription for Hytrin 4mg for BPH symptoms, provided plaintiff with a vaccine for influenza, and scheduled a follow-up examination with plaintiff in three to four months.(See Tr.131, 134).

Wilbur J. Nelson, Jr., Ph.D. reviewed plaintiff's file and completed a Psychiatric Review Technique form on December 24, 2003,  following plaintiff's  request for reconsideration of the denial of SSI benefits.  (See Tr. 116-30).   Dr. Nelson concluded that although plaintiff's impairment resulting from an affective disorder was severe, it was not expected to last twelve months.  (See Tr. 116; see also Tr. 119).   He also indicated that as of June 30, 2004, plaintiff should have only mild difficulties in maintaining social functioning and concentration,

---

[15]On or about this date, plaintiff was evaluated by Sharon Bisighini, staff optometrist at VA, for an eye examination. (See Tr. 137-41). Dr. Bisighini diagnosed plaintiff with hyperopia/presbyopia and ordered glasses with new lens prescriptions. (See Tr. 139-40).

persistence, or pace with mild restrictions of activities of daily living and with no episodes of decompensation of extended duration. (See Tr.126).  Dr. Nelson diagnosed plaintiff with major depressive disorder, chronic adjustment disorder with depressed moods, and ruled out PTSD.  (See Tr.128).  Dr. Nelson noted that plaintiff's major depression had improved in response to the medication and mental status findings reflected moderate impairment with improvement as compared to the earlier assessment. (See id.).[16]

On January 16, 2004, plaintiff was seen by Nurse Fowler for follow-up treatment for major depression and medication management.  (See Tr. 198).  Plaintiff reported his mood as "stable."  (See id.).  Nurse Fowler assigned plaintiff a GAF score of 50.  (See id.).  Thirteen days later, plaintiff underwent an endoscopy for the removal of "one tiny polyp."  (See Tr. 185-94; see also Tr. 195-97).

On February 20, 2004, Nurse Fowler's notes indicate that plaintiff was "moderately depressed"; one stressor was the denial of the renewal of his commercial drivers license by State of Connecticut.  (See Tr.183).  Plaintiff reported being "motivated to return to work but . . . having difficulty securing employment secondary to being in jail."  (See id.).  Nurse Fowler diagnosed plaintiff with major depression but noted that plaintiff was coping and functioning fairly well despite existing stressors.  (See id.).  Nurse Fowler assessed plaintiff's GAF score at 50.  (See id.).  Plaintiff was directed to continue on Wellbutrin 75mg and Trazodone 100mg for treatment of depression and sleep disturbance. (See id.).

On April 15, 2004, plaintiff was evaluated by Nurse Miles for a follow-up visit for his mental health treatment.  (See Tr. 178, 180-82, 239-41).  Plaintiff reported that he was not taking his medication consistently because he "dislike[s] . . . taking med[ication]" although

---

[16]The earlier assessment referred to by Dr. Nelson is the initial disability determination conducted by Dr. Gregory Hanson on November 13, 2003.  (See Tr.92-112).

his "symptoms are bothersome." (See Tr.181, 240).   Specifically, plaintiff reported that he had not been taking Wellbutrin due to experiencing "night sweats," however, he agreed to restart the drug to treat his depressed mood.   (See Tr. 178).   Plaintiff was also taking Trazodone 100mg and continued to be diagnosed with major depression/adjustment disorder.   (See id.).   Plaintiff reported a "number of psycho[-]social concerns including housing [and] work that have [a]ffected [his] mood." (See Tr.181, 240).   Plaintiff also reported nocturia now two to three times nightly and decreased force of stream. (See id.). Nurse Miles indicated that plaintiff's symptoms of BPH  returned due to his noncompliance with treatment. (See id.).  She educated plaintiff on the importance of compliance. (See id.). Nurse Miles referred plaintiff to Nurse Fowler to discuss the side effects of Wellbutrin and the benefits of ongoing treatment or using an alternative agent. (See id.). Nurse Miles also noted that plaintiff's January 2004 colonoscopy results revealed that  a "hyperplastic rectal polyp" was removed, and that plaintiff had "diverticuli." (See Tr. 182, 241).   Plaintiff was educated about the signs and symptoms of diverticulosis. (See id.).

On that same day, plaintiff was seen by Nurse Fowler. (See Tr. 237).  Plaintiff agreed to restart the Wellbutrin despite the "night sweats" side-effect.  (See id.).  Nurse Fowler noted that plaintiff is sleeping well with the Trazodone.  (See id.).

Plaintiff returned to Nurse Fowler for follow-up mental health treatment and medication management on June 25, 2004.[17] (See Tr.235-36).  Plaintiff claimed he stopped taking Wellbutrin due to the side effect of sweating and reported that he  "feel[s] down in the dumps," and he has a low energy level.  (See Tr.235).  Accordingly, plaintiff requested a change in medication.  (See id.).  Plaintiff reported that he is sleeping fairly well, has a

---

[17]Plaintiff failed to show for his appointment at the mental health clinic on June 14, 2004; plaintiff claimed he forgot about the appointment. (See Tr.179, 238).

good appetite, a stable weight, and that he is not using any substances. (See id.).  Nurse Fowler noted that plaintiff's mood was moderately depressed in context of his multiple psycho-social stressors, homelessness and unemployment, and she assessed plaintiff's GAF score at 45. (See id.).  However, Nurse Fowler observed that plaintiff was interested in the "[Compensated Work Therapy] program and is motivated to work." (See id.).  She discontinued the Wellbutrin and prescribed  Remeron 15mg and Trazodone, 100mg for treatment of plaintiff's depression and sleep disturbance. (See id.).

On July 19, 2004, plaintiff testified at his  hearing before ALJ  Liberman. (See Tr.246-68).  Plaintiff testified that he was working as a limousine driver until 1996 when he was in an automobile accident for which he received Workers' Compensation benefits.  (See Tr. 253).  He resumed working about one year later until he was incarcerated for four years in Connecticut.  (See id.). Plaintiff testified that chronic depression is his "biggest problem[ ]", and he has a bruised kidney, and he used marijuana and alcohol until he found out that he was suffering from depression.[18] (See Tr. 254-57).   Plaintiff also testified that he is on medication for his prostate and that he has back pain. (See Tr. 257-59).   According to plaintiff, he did nothing to initiate the situation he is in and "what had happened to [him] brought [on his] depression." (See Tr. 261).  Moreover, he indicated that it was not until he was arrested in 1999 that he knew what happened to him in the military precipitated his depression. (See Tr. 264).  Plaintiff testified that he is able to get up every morning and shower, is responsible for mowing the grass at his current residence, shops and cooks for himself, goes to church, and he has no difficulty taking care of his own personal needs. (See

---

[18]During plaintiff's testimony, plaintiff denied use of cocaine, despite previous self reports of cocaine use and positive toxicology reports for the presence of cocaine in plaintiff's urine.  (See Tr.255).

Tr.260-63).  Plaintiff testified that he is being referred to a VA facility in Rocky Hill for mental health and substance abuse treatment. (See Tr.266-67).

On August 2, 2004, Nurse Fowler examined plaintiff at a follow-up visit for his treatment of depression and for medication management.[19]   (See Tr.232-33).   Plaintiff reported an improved mood and increased energy level.  (See Tr. 232).  Plaintiff indicated the various stressors affecting his mood including,  "unstable housing, unemployment, active PTSD symptoms" and plaintiff denied alcohol or substance abuse. (See id.).  Plaintiff requested a screening for PTSD and to begin Compensated Work Therapy ["CWT"]. (See id.).  Nurse Fowler noted a history of major depression with an improved mood since plaintiff restarted medication and she noted the absence of mood swings, mood lability, or hypomanic or psychotic features, however, she assigned plaintiff a GAF rating of 45. (See id.).

On or about August 3, 2004, plaintiff was evaluated by Heather Lang, a program assistant, for the CWT program.  (See Tr.230).  During the evaluation, plaintiff reported that his depression was his greatest barrier to employment.  (See id.).  Ms. Lang, however, reported that plaintiff's "unemployment was due to two incarcerations."  (See id.).  Plaintiff indicated that his sleeping habits are erratic and that he would not be reliable to show up at work on time every day.  (See id.).   He  sometimes wakes up early in the morning but at other times does not wake up until after noon, so that plaintiff noted that he would be more successful in a position that begins in the afternoon.  (See id.). Plaintiff also reports that he

---

[19]On July 15, 2004, plaintiff telephoned Nurse Fowler and reported that he had discontinued his medication, Remeron, due a side effect, episodic sustained erections. (See Tr. 234). Plaintiff indicated that he had not been taking his prescribed Trazodone for awhile. (See id.). Nurse Fowler scheduled an appointment with the plaintiff for July 21, 2004, however there is no record of any visit to the Veterans Administration Medical Center occurring on July 21, 2004. (See id.).

would like to continue his career as a driver, but as a truck driver, and that he would like to obtain a CDL license but does not have the funds to do that at this time. (See id.).  Ms. Lang enrolled plaintiff into the CWT hospital-based program to reintroduce a work routine to plaintiff as well as to assess the effects of plaintiff's depression on his ability to maintain a work routine. (See id.).[20]

On August 19, 2004, plaintiff was evaluated by Nurse Miles for an annual examination and for continued treatment of BPH symptoms. (See Tr. 221-25). Plaintiff denied any medical complaints and reported that his "problems center around his dysphoric mood"and PTSD symptoms and that it is his "psych issues" that interfere with him finding employment. (See Tr. 222). Plaintiff reported improved nocturia, no hesitancy or frequency and successful outcomes with Viagra. (See id.).  Nurse Miles indicated that plaintiff's symptoms of BPH greatly improved with adherence to treatment and plaintiff was "urged to resume [T]erazosin." (See Tr. 224).  Plaintiff refused a toxicology screen, although one was needed to enter the CWT program; Nurse Miles noted that plaintiff seems motivated to stop using marijuana in order to enter the work therapy program. (See id.).

On the same day, plaintiff was seen  for follow-up mental health treatment with Nurse Fowler.   (See Tr. 219-20). Plaintiff reported an improved mood  since restarting the Remeron, but remains depressed with a low energy level. (See Tr. 219).   Nurse Fowler indicated that plaintiff continues to present with a history of major depression and "R/O Adjustment Disorder." (See id.). She noted that while plaintiff's mood is "moderately

---

[20]On August 9, 2004, plaintiff attended CWT orientation; however, there is no record of plaintiff's enrollment in the program.  (See Tr. 229). On August 19, 2004, James Aleksunes conducted an intake interview with plaintiff and noted that plaintiff would prefer a part-time position in the afternoon; however, plaintiff must provide a "u-tox for illicit substances." (See Tr. 226). A note in the medical record, dated September 8, 2004, indicated that plaintiff did not follow up for participation in the CWT program. (See Tr. 218).

depressed in the context of multiple psycho[-]social stressors," plaintiff denied entrenched symptoms of depression and mood swings. (See id.). Nurse Fowler increased plaintiff's dosage of Remeron to 30mg qhs and recommended that plaintiff continue taking Ambien 10mg. (See id.). Nurse Fowler also referred plaintiff for a PTSD evaluation. (See id.).

On September 14, 2004, Dr. Shuba Rodrigues, the attending psychiatrist at the VA, conducted a psychiatric evaluation of plaintiff for PTSD, during which plaintiff claims that "[he had] been bothered for a lot of years since going into the military." (See Tr. 215-17). Plaintiff reported feelings of helplessness, an intense fear associated with his arrest in Germany, and a sense of being treated unfairly and humiliated during this ordeal. (See Tr. 216). Dr. Rodrigues diagnosed plaintiff with major depressive disorder and alcohol and marijuana dependence, but ruled out "PTSS." (See id.). Dr. Rodrigues noted that plaintiff presented with evidence of depression but did not "elicit any avoidance criteria or questionable hyperarousal symptoms" associated with PTSD. (See Tr. 213, 215, 217).

A month later, on October 21, 2004, plaintiff was evaluated by Jeffrey Cohen, Ph.D. for the SSA. (See Tr. 199-207). Dr. Cohen administered a series of tests including Rey's 3x5, Bender-Gestalt Visual-Motor Designs Test, WAIS-III, SCL-90R, MCMI-III, the Rorschach test, and a mental status examination. (See Tr.199). Based on the cognitive and intellectual assessments, Dr. Cohen concluded that plaintiff has an average IQ of 91, he has "very modest visual-motor impairments" that do not suggest that he is suffering from any central nervous impairments, and he has a host of mild cognitive weaknesses that are indicative of limited intellectual capability, but not of cognitive distortions. (See Tr. 201). That notwithstanding, Dr. Cohen observed that plaintiff has a "high level of intellectual functioning." (See Tr. 204). Based on the results of the personality assessments, Dr. Cohen reported that plaintiff cries easily, has feelings of worthlessness and is "extremely distressed

17

by his loss of sexual interest and pleasure, and he feels that others are to blame for most of his troubles." (See Tr. 202).

Dr. Cohen found that plaintiff has a "severely depressed mood," showing a "potentially maladaptive style for experiencing and expressing emotion." (See Tr. 203).   Dr. Cohen also noted that plaintiff is distressed by unpleasant  thoughts and is easily annoyed and  irritated. (See Tr. 202). Dr. Cohen concluded that these symptoms suggest an ongoing depressive disorder, agitated depression and withdrawal from others. (See id.). He noted that although plaintiff is able to understand and carry out short simple instructions, he has a slight impairment in understanding and carrying out detailed instructions and has moderate impairments in making judgments about simple work decisions. (See Tr. 206).  According to Dr. Cohen, plaintiff has a moderate restriction in responding appropriately to work pressures in a work setting and to changes in a routine work setting. (See Tr. 207).  Moreover, plaintiff has a marked restriction to interacting with the public, but is only moderately restricted when interacting with supervisors and peers.  (See id.).   Dr. Cohen diagnosed plaintiff with a history of major depression disorder that is ongoing, persistent and chronic; mixed polysubstance abuse, in remission; and   mixed personality disorder with traits including schizoid, avoidant, and dependent features. (See Tr. 204-05, 207).  Additionally, plaintiff has a history of back pain, enlarged prostate, a history of diverticulitis and enlarged rectal polyps, as well as severe psycho-social stressors.  (See Tr. 205).   Dr. Cohen assessed plaintiff's current GAF score at 55, with the highest being 65 within the past year.[21] (See Tr. 205).  He

---

[21]A GAF rating between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job). See DSM-IV-TR at 34 (emphasis omitted). A GAF rating between 61 and 70 represents a person with some mild symptoms (e.g., depressed mood and mild insomnia) or had some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning fairly

noted that plaintiff was currently sober with no impairment from substance abuse but plaintiff would be at risk for deterioration if he were to begin using alcohol or drugs again. (See Tr.207).

On November 17, 2004, Nurse Fowler re-examined plaintiff for continued treatment of his major depression, PTSD, and for medication management. (See Tr. 213-14). Plaintiff reported that his mood had improved, his appetite had increased and his sleep had improved, despite his report of sleeping more than usual. (See Tr. 213). Nurse Fowler reported that plaintiff's mood significantly improved with the increased dosage of Remeron and that  plaintiff denied vegetative signs or symptoms, anxiety, mood swings, hypomanic behaviors, or psychotic features. (See Tr.214). She assessed plaintiff's GAF score at 50. (See id.). Plaintiff's prescription for Remeron, 45mg qhs was refilled but his dosage of Ambien was reduced to 5mg qhs to decrease plaintiff's need for sleep. (See id.).

On December 1, 2004, plaintiff was evaluated at the VA by Nurse Miles for lower back pain. (See Tr.210-12).[22]  Plaintiff reported a history of a work-related back injury and  a "flare[ ]" up of the pain in his lower back.[23] (See Tr.211).  Plaintiff also reports that his urinary signs and symptoms are no longer bothersome due to the medication. (See Tr.211; see also Tr. 212).   Nurse Miles concluded that plaintiff's back pain was a "flare of old back pain [that gets] worse with inclement weather[, but that plaintiff] usually tolerates [the pain]

---

well, has some meaningful interpersonal relationships.  See DSM-IV-TR at 34 (emphasis omitted).

[22]On the same day, Nurse Carr provided plaintiff with the testing kit for a colorectal screening.  (See Tr. 209).

[23]Plaintiff testified at the hearing before ALJ Liberman that in 1996 he was involved in a motor vehicle accident during the course of his employment as a limousine driver. Plaintiff reported that, as a result of this accident, he suffered an injury to his lumbar spine and left kidney. (See Tr.253, 255).

well." (See Tr.212).   Nurse Miles also noted that plaintiff reported "considering return[ing] to SADP for help with [alcohol]  and [marijuana] abuse." (See id.).

On January 20, 2005, plaintiff attended a medication management session follow-up mental health appointment with Nurse Fowler. (See Tr.242-43). Plaintiff indicated that his mood had improved and rated his depression a four on a scale from one to ten, with ten being the highest level of depression. (See Tr.242).  He continued to report prolonged sleep into the late morning, but Nurse Miles noted that "this may be related to lack of structure." (See id.).  Plaintiff reported an increased appetite, a moderate energy level, and some anhedonia as he tends to isolate himself. (See id.). Plaintiff was "goal-oriented" and planned to start the CWT program.  (See id.).  Nurse Fowler indicated that plaintiff had a "low moderate level of depression," without "vegetative [signs or symptoms], mood swings, [or] hypomanic behaviors" and she assigned a GAF score of 50. (See id.).   Nurse Fowler noted that plaintiff was reporting "active PTSD symptoms , flashbacks, re[-]experiencing traumatic events, nightmares, [and] sweats." (See id.).  Nurse Fowler continued plaintiff on Remeron 45mg qhs and Ambien 10mg, as needed for sleep disturbance. (See id.).

Eleven days later, on January 31, 2005, ALJ Liberman held a supplemental hearing[24] at which a medical expert, Bill Fuess, Ph.D. (Tr. 57-59), a clinical psychologist, and a vocational expert, Ronald Freedman (Tr. 52-54), testified.  (See Tr.269-92).   Based on his review of plaintiff's records,  Dr. Fuess testified that there is evidence of a major depressive disorder with a fluctuation in symptoms, and symptoms of PTSD that "seem to wax and

_____

[24]ALJ Liberman held this supplemental hearing to have a medical expert and vocational expert testify "[b]ecause of additional developments and various issues."  (See Tr. 271).

On December 23, 2004, plaintiff's then counsel, Alan Rosner, submitted "updated" records from the VA for ALJ Liberman's review.  (See Tr. 208).

wane."  (See Tr. 273-74).  Dr. Fuess testified that "the post[-]traumatic stress disorder
[indicated] in the records . . . is not really firmly noted in . . . terms of the symptoms."  (See
Tr. 274).

Dr. Fuess noted that plaintiff's GAF scores have "some fluctuation" with a low of 40
reported when plaintiff was seeking treatment for alcohol and marijuana dependence, i.e.,
"when there was substance abuse."  (See Tr. 273-75).  Dr. Fuess observed that plaintiff had
a GAF of 45 in July and August 2004 which shows that his depression fluctuates (see Tr. 279-
88), and when his GAF score is 45, there is "going to be some impact . . . , in terms of
concentration abilities."  (See Tr. 282).  At that time, when his score is so low, plaintiff would
meet or equal one of the Listings.  (See Tr. 276).  However, in November 2003, plaintiff
entered into a substance abuse program, after which, according to Dr. Fuess, plaintiff has
a capacity to function, though with "marked" problems with the public, but not with
coworkers.  (See Tr. 276-77).  Additionally, according to Dr. Fuess, plaintiff would experience
some difficulties adjusting to change in a work situation.  (See Tr. 278).

Dr. Fuess also testified that plaintiff has the capability of understanding and carrying
out simple instructions and only a mild to moderate impairment in judgment, with no
mention of any impairment of concentration. (See Tr. 277-78).  Moreover, Dr. Fuess testified
that when plaintiff exhibited symptoms of PTSD, there is nothing to indicate that his
concentration was impaired.  (See Tr. 281-82).

Ronald Freedman testified that plaintiff's position as a limousine driver was a semi-
skilled level position and in light of plaintiff's limitations, plaintiff would be precluded from
his previous occupation. (See Tr. 286-87).  When  asked if employment exists for a person
who requires light and sedentary jobs with only simple instructions and limited exposure to
the public, Freedman testified that there exists employment positions within the national

economy that met that criteria and opined that plaintiff could perform unskilled, non-exertional work as an assembler, fabricator, grinder, or polisher. (See Tr. 287-89). Freedman further testified that, on an episodic basis, a worker with a marked limitation in his ability to concentrate and pay attention to the work one day a week "might be able to perform" the jobs identified though "their productivity would be significantly diminished." (See Tr. 290-91). Freedman acknowledged that a typical employer would "probably not" tolerate an employee with a marked limitation in his ability to pay attention and concentrate one full day a week. (See Tr. 292).

## III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence

and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits

23

only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's residual functional capacity by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)). _____

## IV. DISCUSSION

_____Following the five step evaluation process, ALJ Liberman found that plaintiff has not engaged in substantial gainful activity since the alleged onset of his disability. (See Tr. 17, 22). The ALJ found that the medical evidence establishes that plaintiff has been treated for major depression and a history of alcohol abuse which are severe but which do not meet or medically equal the criteria of any of the impairments in Appendix 1, Subpart P, Regulation

24

No.4.  (See Tr. 19-20, 22).  Additionally, ALJ Liberman found that plaintiff's allegations regarding his limitations are not totally credible and based on all factors, plaintiff retains the residual functional capacity to perform all extertional work.  (See Tr. 20, 22).  Based on plaintiff's residual functioning capacity, the ALJ then determined that plaintiff cannot perform his past relevant work as a limousine driver.  (See Tr. 20-21, 22).  Upon making this determination, the burden shifted to the Commissioner to show that plaintiff has the residual functional capacity to perform other substantial gainful activity and that there is other work existing in the national economy that plaintiff can perform.  The remaining issue in this case, therefore, is whether the ALJ  properly found that the Commissioner satisfied her burden.

Before applying the standards articulated in the Grid, the ALJ must address whether plaintiff has any non-exertional limitations which would substantially limit his capacity to work and preclude reliance on the Grid.  Accordingly, the ALJ concluded that plaintiff does have non-extertional limitations which limit activity to "simple, repetitive entry level work (except those jobs requiring interaction with the public)."  (See Tr. 20).  ALJ Liberman found that, pursuant to the Regulations, plaintiff is classified as an "individual closely approaching advanced age" with a high school education and a background of semi-skilled employment; however, the transferability of such skills is immaterial due to the limitations of plaintiff's residual functional capacity. (See Tr. 21-22). ALJ Liberman considered the testimony of the vocational expert, who opined that given plaintiff's limitations of sedentary and light work and the residual functional capacity as outlined, there exist "in significant numbers in the national economy" jobs within plaintiff's residual functional capacity, including work as an "assembler/fabricator. . . and grinder/polisher." (See Tr. 21-22).  Accordingly, ALJ Liberman concluded that plaintiff was not under a "disability" at any time through the date of his decision.  (See Tr. 22-23).

25

Plaintiff seeks reversal of the Commissioner's decision and a remand of this matter for a new hearing consistent with the findings. (See Dkts. ##15-16).  Plaintiff contends that the ALJ failed to properly consider the medical evidence that plaintiff is per se disabled as his impairments meet or equal Listing § 12.04 and ALJ Liberman failed to properly evaluate the treating sources and develop the record. (Dkt. #16, at 16-22).  Plaintiff also argues that ALJ Liberman relied on flawed vocational expert testimony (id. at 22-23), and that the ALJ's evaluation of plaintiff's credibility is based on legal error and lacks the support of substantial evidence. (Id. at 23-24).

In opposition, defendant responds that substantial evidence supports the ALJ's finding that plaintiff was not disabled at any relevant time and had no impairment of listing level severity (Dkt. #18, at 9-16), and substantial evidence supports the ALJ's conclusion that plaintiff retained an RFC for the performance of a significant number of jobs in the national economy. (Dkt. #18,  at 16-20). The Court considers these arguments below.

A. CONSIDERATION OF THE MEDICAL EVIDENCE: LISTING § 12.04

According to plaintiff, ALJ Liberman failed to properly consider the medical evidence that the plaintiff was per se disabled as he met or equaled Listing § 12.04.[25] (Dkt. #16, at

---

[25]Affective Disorder, as defined in Section 12.04 is

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or

16-18).  Plaintiff argues that the medical evidence documents a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; decreased energy; feelings of guilt or worthlessness; and difficulty thinking or concentrating; therefore, plaintiff's symptoms meet the criteria under § 12.04(A).  (Id. at 16).   Plaintiff further posits that Dr. Fuess and Dr. Cohen both noted that plaintiff meets the requirement of § 12.04(B)(2) and (B)(3), in their

---

b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i.  Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractability; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR
C. Medically documented history of a chronic affective disorder . . . .

20 C.F.R. 404, Subpt. P, App. 1, § 12.04.

27

Case 3:05-cv-01315-JBA   Document 20   Filed 09/08/06   Page 28 of 44

remarks that plaintiff has marked difficulties in maintaining social functioning and marked difficulties maintaining concentration, persistence or pace.  (Dkt. #16, at 17).  Additionally, plaintiff urges that his GAF score of 45, as Dr. Fuess testified, makes plaintiff <u>per se</u> disabled.[26] (Dkt. #16, at 17).  Additionally, plaintiff contends that ALJ Liberman failed to set forth with enough specificity his rationale for concluding that plaintiff did not meet the requirements under § 12.04. (Dkt. #16,  at 18).

In opposition, defendant asserts that ALJ Liberman provided support for his conclusion that plaintiff failed to meet his burden of proof that his disability meets the severity requirements under Listing §12.04.  (Dkt. #18, at 11-14).  Defendant observes that ALJ Liberman documented evidence that plaintiff is motivated to work, he improved with medication, he experienced some ahenodia related only to his lack of finances, he has a good appetite and stable weight and, in light of the foregoing, plaintiff fails to satisfy the criteria listed under §12.04(A).  (Dkt. #18, at 13).  Additionally, the Commissioner contends that although plaintiff demonstrated a significant impairment in social functioning, ALJ Liberman did not find that plaintiff had marked restriction in his activities of daily living or concentration and did not have repeat episodes of decompensation. (<u>See</u>  Dkt. #18, at 13-14).

1. § 12.04(A)

As stated above, to meet Listing § 12.04(A), plaintiff must establish medically documented persistence of a depressive syndrome characterized by at least four of the

_____

[26]Plaintiff claims that "by Dr. Fuess['] own testimony, since [plaintiff's] GAF score never raises above 50, [plaintiff] would meet or equal the <u>per se</u> disability Listing during his entire treatment history."  (Dkt. #16, at 17). As stated above, a GAF score of 50 denotes symptoms that are moderate, whereas a GAF score below 50 is classified as "serious symptoms."  <u>See</u> notes 7, 8, 12 & 21 <u>supra</u>.

following: anhedonia, appetite disturbance, sleep disturbance, psychomotor retardation, decreased energy, feelings of guilt or worthlessness, difficulties concentrating, thoughts of suicide, or hallucinations.  Nurse Fowler diagnosed and treated plaintiff for major depression, chronic adjustment disorder and substance abuse with supportive therapy and medication management therapy from September 2003 to January 2005. (See Tr. 113-115, 135-36, 153-54, 166-69,198, 183, 213-14, 219-20, 232-33, 235-37, 242-43).  Throughout plaintiff's treatment, Nurse Fowler documented plaintiff's depressed mood, and plaintiff's reports of feeling "down" or "low," his feelings of worthlessness, and of experiencing mild anhedonia and sleep disturbances. (See Tr. 135, 153, 166, 173, 213, 235).  Additionally, Nurse Melanese Kotey, who evaluated plaintiff right before his admission to SADP in October 2003, noted that plaintiff was experiencing feelings of sadness, anhedonia, guilt and hopelessness. (See Tr. 146).  However, the treatment records reflect that once plaintiff learned that "[the] amount of [alcohol] and [marijuana] use represents [a] problem" in terms of his depressive symptoms (see Tr. 162; see also Tr. 255-57), and once plaintiff received treatment in SADP and with medication,[27] his improvement is consistently documented.

On November 24, 2003, and again on April 15, 2004, plaintiff reported to Nurse Fowler that his sleep had improved since he began taking Trazodone.  (See Tr. 135, 237). Additionally, in a report co-signed by Dr. D'Souza in November 2003, Nurse Fowler recorded that plaintiff's depressive symptoms had subsided since the initiation of Wellburtin and although his sleep was still fragmented, his sleep disturbance should improve with Trazodone. (See Tr. 113).  Although she noted plaintiff's low motivational level, she also

---

[27]When plaintiff admittedly stopped taking his Wellbutrin, he accordingly reported that he was "feel[ing] down in the dumps" and that he was experiencing a low energy level.  (See Tr. 235).

observed his "slow-up-to-task completion" which was indicative of plaintiff's future success with treatment.  (See Tr. 115).   By January 2004,  plaintiff's mood was "stable," (see Tr. 198),  and a month later, plaintiff reported that although he was "moderately depressed," he was "motivated to return to work." (See Tr. 183).   In June 2004, plaintiff reported that he was sleeping fairly well, he had a good appetite, a stable weight, and he was motivated to work.  (See Tr. 235-36).[28] This improved mood since he had started taking Remeron, and his motivation to work is also recorded in August 2004 by Nurse Miles and Nurse Fowler. (See Tr. 219, 224).[29] In August 2004, plaintiff also reported that he remained depressed with a low energy level but he denied entrenched symptoms of depression and mood swings. (See Tr. 219).   However, during the next three months, plaintiff reported feelings of hopelessness to Dr. Rodrigues, and presented with evidence of depression, though he did not elicit any symptoms associated with PTSD.  (See Tr. 213-17).

In October 2004, a year after plaintiff was first prescribed medication for his depression, and a year after plaintiff was admitted to SADP, Dr. Cohen evaluated plaintiff for the SSA and in doing so, reported that plaintiff had a severely depressed mood and his "speech reveals self-pity, inadequacy,[and] feelings of worthlessness." (See Tr. 203-04). Over the course of the next month, however, Nurse Fowler reported plaintiff's mood had improved, his appetite had increased, his sleep had improved, and plaintiff denied any vegetative signs.  (See Tr. 213).   Such improvement was also recorded in January 2005

---

[28]In contrast to the foregoing, however, Nurse Fowler assessed plaintiff's GAF score at this time at 45.  (See Tr. 235).

[29]Plaintiff, however, also reported that his "problems center around his dysphoric mood" and PTSD symptoms and that it is his "psych issues" that interfere with him finding employment." (See Tr. 222).

along with a moderate energy level, increased appetite and "some anhedonia."  (See Tr. 242).  At that time, Nurse Fowler noted that plaintiff was also "goal-oriented."  (See id.).  Thus, while plaintiff's improvement in his mood and sleep disturbance with the assistance of medication is well-documented, plaintiff's depression persists and such persistent symptoms are equally documented throughout the medical record.   As Dr. Fuess acutely observed, the medical record reveals evidence of a depressive disorder with symptoms that "fluctuate" "probably weekly."  (See Tr. 279).   Thus, ALJ Liberman's conclusion that "[m]any of the requirements of Part A of [Listing 12.04[30]] are absent," is not supported by substantial evidence in the record.  However, in order for plaintiff's "severe" major depression to met or medically equal Listing § 12.04, in addition to satisfying § 12.04(A), plaintiff must also satisfy § 12.04(B).[31]

### 2. § 12.04(B)

Under § 12.04(B), two of the four limitations must be documented; these limitations include: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation. See 20 C.F.R. 404, Subpart P, App. 1, § 12.04. Although there is evidence that plaintiff does have some limitations in his social interactions, and specifically in his interactions with the public, there is little evidence that plaintiff has marked restrictions under the other criteria listed under 12.04(B).

On November 13, 2003, Dr. Hanson, who reviewed plaintiff's file for disability

---

[30]ALJ Liberman also refers to Listing 12.06 but plaintiff does challenge that in his motion. (See Tr. 19-20).

[31]As an alternative, a claim may also satisfy § 12.04(C), but that is not at issue here.  See 20 C.F.R. 404, Subpt. P, App. 1, § 12.04.

determination purposes, reported that there was no evidence of plaintiff's level of functioning and a lack of certainty of the  presence of plaintiff's depressive disorder without drugs or alcohol.  (See Tr. 92-96, 98-112).   Dr. Hanson concluded that  plaintiff's ability to maintain attention and concentration for extended periods, his ability to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerance, sustain routine without supervision, work in coordination with or in  proximity to others without being distracted by them, and to make simple work related decisions is "not significantly limited." (See Tr. 92).  He did conclude, however, that plaintiff is "moderately limited" in his ability to understand, remember and carry out detailed instructions, and complete a normal workday or workweek or to interact appropriately with the general public. (See Tr. 92-93). Dr. Hanson also concluded that, although plaintiff's depressive symptoms and drinking impact his suitability for work with the public, plaintiff can interact at a basic level with others, keep a reasonable appearance, ask questions and form basic goals. (See Tr. 94).   Likewise, Dr. Nelson, who evaluated plaintiff for SSA on December 24, 2003, found that plaintiff only has "mild" difficulties in maintaining social functioning and concentration, persistence, or pace with "mild" restrictions of activities of daily living and with no episodes of decompensation of extended duration. (See Tr.126).   Dr. Nelson also noted that plaintiff's major depression had improved in response to the medication and mental status findings reflect moderate impairment with improvement as compared to the earlier assessment made by Dr. Hanson. (See Tr.128).

Nurse Fowler further opined  that plaintiff "is independent and able to attend to ADL's without assistance," and although she reports that plaintiff has a low motivational level, she concludes that plaintiff is "able to slow-up-to-task completion. " (See Tr. 114-15).  Dr. Cohen,

32

consistent with Nurse Fowler's assessment, reports that plaintiff has slight limitations in understanding, remembering and carrying out detailed instructions and a moderate impairment in making judgments about simple work related matters.  (See Tr. 206). Additionally, according to Dr. Cohen, plaintiff has a moderate restriction in responding appropriately to work pressures in a work setting and to changes in a routine work setting. (See Tr. 207).  Dr. Cohen further opined that plaintiff has a marked restriction in interacting with the public, but is only moderately restricted when interacting with supervisors and peers.  (See id.).  The foregoing notwithstanding, Dr. Cohen concluded that plaintiff has an average IQ of 91 and a "high level of intellectual functioning."  (See Tr. 201, 204).

At the supplemental hearing,  Dr. Fuess opined that although plaintiff would have marked difficulties dealing with the public, plaintiff is capable of understanding and carrying our simple instructions, does not have marked limitations in judgment, and could engage in basic judgment decisions. (See Tr. 277-78).  Dr. Fuess also noted that he did not see anything in the record indicating marked limitations in judgment or marked concentration difficulties.[32]  (See Tr.  278, 282). Thus, there is no evidence that plaintiff had marked limitations in either his activities of daily living or concentration, and therefore ALJ Liberman's determination that plaintiff failed to meet the criteria under 12.04(B) is supported by substantial evidence.[33]

---

[32]Dr. Fuess did testify, however, that if a person has a GAF score of 45, there will be "some impact . . . in terms of concentration abilities."  (See Tr. 282); see Section III.A.3. infra.

[33]Plaintiff further argues that ALJ Liberman failed to set forth with specificity the rationale behind his decision that plaintiff fails to meet the requirements of one of the listed impairments. (Dkt. #16, at 18).  An ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment."  Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982). However, when the court is able to "look to other portions of the ALJ's decision and to clearly credible evidence in finding that [the ALJ's] determination was supported by substantial evidence," the absence of an explicit rationale is not cause for a remand.  Id.   In this case, while ALJ

### 3. ASSESSMENT OF THE GAF SCORE

According to plaintiff, Dr. Fuess' testimony is "[c]ritical to the evaluation of the Listing" as Dr. Fuess testified that a GAF score of 45 indicated serious symptoms of Listing level, and since plaintiff's GAF score never raises above 50, plaintiff would "meet or equal the per se disability Listing during his entire treatment history."[34] (Dkt. #16, at 17).   Despite plaintiff's contention, the GAF scale "does not have a direct correlation to the severity requirements in" the Listings.  See  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01, at  50764-65 (August 21, 2000).  The GAF score is "only one piece of evidence" and the ALJ should evaluate "all the findings of treating and consultative psychiatric specialists to determine plaintiff's mental limitations . . . ." Catrain v. Barnhart, 325 F. Supp.2d 183, 192 (E.D.N.Y. 2004). "[S]tanding alone, the GAF score does not evidence an impairment seriously interfering with [a] claimant's ability to work."  Lopez v. Barnhart, 78 Fed. Appx. 675, 678 (10th Cir. 2003).  A "GAF score of 40 may indicate problems that do not necessarily relate to the ability to hold a job"; thus,

_____

Liberman posits a simple conclusion with respect to Parts A and B of the applicable Listings, he previously points to evidence that "claimant has done very well when he takes his prescribed medication"; he has an improved mood and increased level of coping and is sleeping better, with a good appetite and moderate energy level; plaintiff has the motivation to work but was having difficulty secondary to a prison record; Dr. Cohen "indicated some moderate limitations"; and  Dr. Fuess testified that there was "no evidence of marked concentration problems." (See Tr. 18-20). Thus, although "[c]ases may arise . . . in which [the court] would be unable to fathom the ALJ's rationale in relation to the evidence in the record," this case does not fall into such a category, and a remand for "further findings or a clearer explanation for the decision" is not required. Berry, 675 F.2d at 469.

[34]Contrary to plaintiff's assertion that Dr. Fuess testified that plaintiff's GAf score never rose above 50, Dr. Fuess testified that there is "some fluctuation" in the GAF score (see Tr. 273), with a low of 40 (see id.) and a high of 65 (see Tr. 275).   While plaintiff argues that Dr. Fuess testified that a GAF score of 45 indicated serious symptoms of Listing level, Dr. Fuess's testimony did not include any reference equating a GAF score to a Listing level. Dr. Fuess testified that in "October of 2003, [plaintiff] has a score of 40, which is a serious impairment," which, in response to the ALJ's inquiry, Dr. Fuess was "of the opinion that it would"  meet or equal one of the Listings.  (See Tr. 275-76).

plaintiff's lowest assigned GAF score of 40 does not yield the result that plaintiff is <u>per se</u> disabled.  <u>Id.</u> at 678 (citation omitted).  The score is one piece of evidence, which does not necessarily contradict the substantial evidence that plaintiff's disability does not meet a Listing § 12.04.

### B. TREATING SOURCES

Plaintiff next argues that ALJ Liberman failed to evaluate the treating sources and develop the record.  (Dkt. #16, at 18-22).  Plaintiff argues that the only acceptable medical opinions are those from Dr. D'Souza, a board certified psychiatrist, Dr. Cohen, a consultative examiner, and Dr. Fuess, the medical expert.  (Dkt. #16, at 19).  Plaintiff, however, questions the validity of Dr. Cohen's assessment because it is unknown whether plaintiff's records were made available to Dr. Cohen who, inconsistent with the rest of the record, assessed plaintiff's GAF score at 55 with a high of 65.  (<u>Id.</u>).  Additionally, according to plaintiff, Dr. D'Souza's report does not comply with 20 C.F.R. § 404.1520a(c)(4)[35] and Dr. Fuess was a non-examining medical expert, so that the ALJ had a duty to develop the medical record.  (Dkt. #16, at 19-21).

Defendant responds that while it is true that the ALJ has a duty to develop the medical record and seek out further information as necessary, where the ALJ possesses a complete medical record, he has no duty to seek additional information before rejecting a

---

[35]20 C.F.R. § 404.1520a(c)(4) provides for a rating system for evaluating the degree of limitations in evaluating mental impairments. Specifically, "the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence or pace), [are rated] . . . us[ing] the following five-point scale: None, mild, moderate, marked, and extreme. . . ."

That notwithstanding, the ALJ will review medical opinion evidence detailing what a claimant can and cannot do, including a claimant's "ability . . . to do work-related activities" and a claimant's ability to "carry out and remember instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting." 20 C.F.R. § 404.1513(c)(1)-(2).

claim. (See Dkt. #18, at 15-16)(citations omitted).

Pursuant to the Second Circuit's treating physician rule, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(citations omitted); see 20 C.F.R. 404.1527(d)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence,. . . [the ALJ] will give it controlling weight."). While "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)(citation omitted), the ALJ must make such determination based on a thorough medical record. Thus, even when a claimant is represented by counsel, the ALJ has an affirmative duty to "seek clarification from a treating physician in the event the physician's report is somehow incomplete."[36] See Geracitano v. Callahan, 979 F. Supp. 952, 956-67 (W.D.N.Y. 1997)(multiple citations omitted).

The Regulations identify the following factors as relevant in deciding the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; if it is, it is accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R.

---

[36]If the evidence received from the treating medical source is "inadequate" for an ALJ to make a determination of disability, the SSA will "seek additional evidence or clarification from [the] medical source . . . ." 20 C.F.R. § 404.1512(e)(1).

§ 404.1527(d).[37] "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments . . . ." 20 C.F.R. § 404.1527(a)(2).  An "acceptable medical source" includes: 1) licensed physicians; 2) licensed or certified psychologists; 3) licensed optometrists; 4) licensed podiatrists; or 5) qualified speech-language pathologists. 20 C.F.R § 404.1513(a).  Nurse practitioners, like Nurse Fowler in this case, are "not included in the list of 'acceptable medical sources.'" Nichols v. Commissioner of SSA, 260 F. Supp. 2d 1057, 1066 (D. Kan. 2003)(citation omitted).  However, nurse practitioners are considered "other sources" from whom evidence can be used to show the severity of a claimed impairment.  See 20 C.F.R § 404.1513(d)(1).  Additionally, as the Ninth Circuit observed in Gomez v. Chater, 74 F.3d 967, 971 (9th Cir.), cert. denied, 519 US. 881 (1996): "A report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is considered acceptable medical evidence. . . ."  Thus, the Ninth Circuit held in Gomez that "a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not."   Id.[38]

---

[37]"Generally, . . . more weight [is given] to opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ."  20 C.F.R. § 404.1527(d)(2).  Moreover, "[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [a claimant]."  20 C.F.R § 404.1527(d)(1).  Accordingly, "[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override a treating physician's opinion."  Schisler v. Sullivan, 3 F.3d 563, 566 (2d Cir. 1993)(internal quotations & citation  omitted).

[38]While there is one other report in the record that constitutes a medical opinion of an acceptable medical source as it was completed by Nurse Miles and co-signed by Dr. Solomon (see Tr. 156-64), Nurse Miles' treatment of plaintiff for his medical complaints, specifically for his BPH, is not at issue here.

Accordingly, the only medical record authored by Nurse Fowler that can be subject to the treating source rule and afforded due weight is the November 24, 2003 report completed for SSA and co-signed by Dr. D'Souza.  (See Tr. 113-15); see Gomez 74 F.3d at 970-71.[39]

Although ALJ Liberman's articulated reliance on Dr. Cohen's and Dr. Fuess' medical opinions are consistent with the medical record and supported by substantial evidence in this record, ALJ Liberman reaches his conclusion by relying on much more of Nurse Fowler's records than the one report co-signed by Dr. D'Souza.  (See Tr. 18-20).[40]   The one report co-signed by Dr. D'Souza, to which the ALJ may afford due weight, however,  is informative and provides a thorough description of plaintiff's ability to perform work-related activities and details their opinions as to the existence and severity of plaintiff's claimed disability (see Tr. 113-14).  See Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991).

In the absence of more than this one report of the treating physician, the opinions of Nurse Fowler, working in conjunction with Dr. D'Souza, are integral to the ALJ's determination of plaintiff's disability.  This notwithstanding, the ALJ's  "reasonable effort[s] to obtain . . .

---

[39]That one report notwithstanding, there is no other evidence of a treating physician in this case so as to invoke the "treating physician rule."  Dr. Cohen was an examining physician and Dr. Fuess is a non-examining medical expert.  Accordingly, it was appropriate for ALJ Liberman to give due weight to Dr. Cohen's opinion as "[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [a claimant]."  20 C.F.R. § 404.1527(d)(1).

Dr. Cohen, who is an acceptable medical source, diagnosed plaintiff with history of ongoing depression, consistent with Dr. D'Souza  and with Dr. Fuess' medical testimony. (See Tr. 199-207).  Dr. Fuess' testimony is also consistent with the medical record in that he testified that plaintiff's records indicate that plaintiff has a major depressive disorder, which fluctuates in severity; plaintiff often displays vegetative signs or symptoms; plaintiff has some sleep difficulties; and plaintiff  has a post-traumatic symptoms that is not firmly rooted in the record.  (See Tr. 273-74).

[40]However, ALJ Liberman specifically refers to the "one report" when he concludes that  it "was apparent from the VA Records, including the report of nurse practitioner Ann Fowler, that the claimant has done very well when he takes his prescribed medication." (See Tr. 20).  While one may presume his reference is to the report co-signed by Dr. D'Souza, such distinction is not explicit.

the medical records of th[is] treating physician," which in this case is this sole report, and his reasonable efforts to obtain "a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability" were satisfied.  Peed, 778 F. Supp. at  1246.  There is no duty to seek additional information where the ALJ has "a complete medical history and the evidence . . . [is] adequate for him to make a determination as to disability." See Perez  v. Chater 77 F.3d 41, 48 (2d Cir. 1996).   The record contains Dr. D'Souza and Nurse Fowler's opinions regarding plaintiff's activities of daily living, social interactions, and task performance, and  Nurse Fowler opined that plaintiff is able to attend to his activities of daily living without assistance, has a limited support system with some communication with his sister, and has good judgment and insight. (See Tr. 113-15). In addition, Dr. Cohen assessed plaintiff's ability to do work-related activities. (See Tr.  206-08). Dr. Cohen opined that plaintiff has good concentration and attention on tasks, with some moderate limitations in his ability to make judgments related to work; has some moderate limitations in his ability to interact appropriately with supervisors and co-workers; and has marked limitations interacting with the public. (See Tr. 206-07).  Thus, ALJ Liberman had substantial evidence upon which to develop an informed opinion as to the status of plaintiff's claimed disability.[41]

---

[41]Plaintiff further questions the validity of Dr. Cohen's assessment because there is no indication that plaintiff's medical records were made available to Dr. Cohen and the recorded GAF score is entirely inconsistent with the record of the treating source. (See Dkt. #16, at 19). Defendant contends that Dr. Cohen was able to obtain sufficient background information and Dr. Cohen's assessment was entirely consistent with the treatment notes. (Dkt. #18, at 14, n.9).

Contrary to plaintiff's contention that Dr. Cohen did not have plaintiff's medical record, there is evidence that Dr. Cohen was furnished with at least some background information. Dr. Cohen noted in his assessment that plaintiff's "medical records report that he had trouble off and on with his medications." (See Tr. 204). Additionally, Dr. Cohen noted that information received from the medical record included the list of prescribed medications as follows: Wellubtrin 75mg twice per day, Trazedone to assist in sleep, Terazosin 2mg for prostate enlargement, a stool

C. FLAWED VOCATIONAL EXPERT TESTIMONY

Plaintiff argues that ALJ Liberman relied on flawed testimony of the vocational expert, as such testimony was elicited in response to what plaintiff categorizes as a flawed hypothetical presented by ALJ Liberman.[42]   (See Dkt.# 16, at 22-23).   Defendant contends that ALJ Liberman presented a hypothetical supported  by substantial evidence  and he need only rely on answers to hypothetical questions which are supported by the record. (See Dkt. #18, at 20).

"A vocational expert's opinion cannot constitute substantial evidence in social security disability proceedings unless the expert precisely considers the claimant's particular physical and mental impairments."   Lesko v. Shalala, 1995 WL 263995, at *6 (E.D.N.Y. Jan. 5, 1995)(multiple citations omitted).  Hypotheticals  are criticized when "there [is] no evidence

---

softener, and Viagra to increase his sexual drive and his medical issues, including back injuries, rectal polyps and an inflamed prostate. (See Tr. 200).  Additionally, the GAF score of 55-65 is an assessment of plaintiff's functioning at the time of the evaluation and the highest during the year. Dr. Cohen's assessment of plaintiff is generally consistent with the Dr. D'Souza's report and is consistent with Dr. Fuess' opinion that plaintiff's impairment fluctuated frequently.

[42]At the supplemental hearing, ALJ Liberman posed the following hypothetical to Ronald Freedman, the vocational expert:

> [L]et's presume that Mr. Jerry at 50 plus, high school graduate, past work as a limousine driver, capable of, - - has marked problems dealing with the public but could function with coworkers and can handle simple instructions, can make basic decisions, can - - . . . deal with changes in a . . . basic work setting, and can handle - - essentially handle simple repetitive work.  Let's assume that he's limited to light and sedentary jobs. Would there be any work he could do in the national economy with that RFC?

(See Tr. 287-88).

In response, Mr. Freedman testified that "there would be jobs. . . that such a person could do.  We probably would stick with . . . unskilled jobs, so that we do [not] compromise the need for simplicity here. That would be in - - basically, in factory kinds of jobs which would decrease the amount of involvement with other people, and to protect the simplicity of that,. . . sedentary to light." (See Tr. 288).

to support the assumption underlying the hypothetical." <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1554 (2d Cir. 1983)(citations omitted).  As stated above, Dr. Cohen opined that although plaintiff is able to understand and carry out short simple instructions, he has a slight impairment in understanding and carrying out detailed instructions and has moderate impairments in making judgments about simple work decisions. (<u>See</u> Tr. 206).  According to Dr. Cohen, plaintiff has a moderate restriction in responding appropriately to work pressures in the work setting and to changes in a routine work setting. (<u>See</u> Tr. 207).  Moreover, plaintiff has a marked restriction to interacting with the public, but is only moderately restricted when interacting with supervisors and peers.  (<u>See id.</u>). Dr. Hanson concluded that plaintiff's ability to maintain attention and  concentration for extended periods, his ability to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerance, sustain a routine without supervision, work in coordination with or in  proximity to others without being distracted by them, and to make simple work related decisions is "not significantly limited." (<u>See</u> Tr. 92).  Additionally, Dr. Fuess testified that although plaintiff has some marked limitations interacting with the public, he could function with co-workers, is capable of understanding and carrying out simple instructions, has good concentration and attention and is able to adapt to changes in simple repetitive type work. (<u>See</u> Tr. 276-78).  Accordingly, such hypothetical is consistent with the evidence in the underlying medical record, and thus was not flawed.[43]

---

[43]Freedman further testified that, on an episodic basis, a worker with a marked limitation in his ability to concentrate and pay attention to the work one day a week "might be able to perform" the jobs identified although "their productivity would be significantly diminished." (<u>See</u> Tr. 290-91). Freedman acknowledged that a typical employer would "[p]robably not" tolerate an employee with a marked limitation in his ability to pay attention and concentrate one full day a week.  (<u>See</u> Tr. 292).

41

D. EVALUATION OF PLAINTIFF'S CREDIBILITY

Plaintiff contends that ALJ Liberman failed to support his credibility finding with the required specificity and thus, his credibility finding is not supported by substantial evidence. (See Dkt. #16, at 23-24).  In response, defendant counters that ALJ Liberman did not disregard plaintiff's subjective complaints, but rather provided a sufficient rationale in his finding that plaintiff was not entirely credible. (See Dkt. #18, at 17-18).

An ALJ must make a determination based on medical facts and other evidence; plaintiff's subjective testimony, alone, is not conclusive evidence of disability.  See Romano v. Apfel, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citation omitted).  Moreover, an ALJ may discredit a plaintiff's testimony if done so with sufficient specificity and if supported by substantial evidence.  See id. at *7 (citations omitted).  SSR 96-7p explicitly provides that when assessing a claimant's credibility, an ALJ must compare the consistency of the claimant's statements both internally and within the case record.  See 1996 WL 374186, at * 5 (July 2,1996).  An ALJ must compare a claimant's statements made in connection with his claim with statements he made under other circumstances that are in the case record; statements a claimant made to treating and examining medical sources are especially important.  See id.

On July 19, 2004, plaintiff testified at his  hearing before ALJ Liberman that chronic depression is his "biggest problem[ ]", and he has a bruised kidney, and he used marijuana and alcohol until he found out that he was suffering from depression. (See Tr. 254-57). Plaintiff also testified that he did not use cocaine (see Tr. 255), though plaintiff's medical records reveal that upon admission to SADP, plaintiff disclosed his prior use of cocaine, ranging from a "dime bag" to an "eight ball," every other day from 1997-1998; plaintiff had

42

positive toxicology reports for the presence of cocaine in his urine; and plaintiff reported that his last use of cocaine was in May 2003.  (See Tr. 146, 162, 255-56).

Plaintiff also testified that  he did nothing to initiate the situation he is in and "what had happened to [him] brought [his] depression." (See Tr. 261).   Further, according to plaintiff, it was not until he was arrested in 1999 that he knew what happened to him in the military precipitated his depression. (See Tr. 264).   In 1982, however, plaintiff pled no contest to charges of rape and burglary and was incarcerated in South Carolina from 1982 until 1993.  (See Tr. 161, 166, 171-72, 200). In 1994, plaintiff relocated to Connecticut and obtained a chauffeur's license and began working for a limousine service. (See Tr. 200). Plaintiff testified that he initially stopped working after his 1996 automobile accident, for which he received Workers' Compensation for one year due to injuries to his left kidney. (See Tr.254-55, 258).  Thereafter, plaintiff returned to work until he was incarcerated again, this time in Connecticut.  (See Tr. 166, 172, 200, 253).  ALJ Liberman accurately stated in his decision that plaintiff has sought work but was unable to find employment due to his prison record.  (See Tr. 20; see also Tr.166, 172, 183, 200, 253).  Additionally, plaintiff's testimony about his daily living activities reveals that he is able to get up every morning and shower, is responsible for mowing the grass at his current residence, shops and cooks for himself, goes to church, and he has no difficulty taking care of his own personal needs. (See Tr.260-63).   Accordingly, ALJ Liberman's conclusion that plaintiff's subjective complaints cannot be fully credited, is supported by substantial evidence in the record and is stated with sufficient specificity.

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Judgment on the Pleadings (Dkt.

43

#15) is <u>denied</u> and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is <u>granted</u>.

The parties are free to seek the district judge's review of this recommended ruling. <u>See</u> 28 U.S.C. § 636(b)(**written objection to ruling must be filed within ten days after service of same**); Fed. R. Civ. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules of United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)(**failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit**).

Dated this 8th day of September, 2006 at New Haven, Connecticut.


/s/
JOAN GLAZER MARGOLIS
UNITED STATES MAGISTRATE JUDGE